You may proceed. Good morning, Presiding Judge McEwen, Judge Ferris, and Judge Vade. I'm Michael Marsh. With me today is my partner Mark Valencia. We're appearing on behalf of Microphone just a little closer. Yes, sorry. Thank you. Now known as North Star Contracting Group and North Star Recovery Services. Given the limited time, I'm going to restrict my arguments to the first three issues raised in our brief relating to the HECO project, which I think are the primary issues. One, no agreement as to all materials of a subcontract. Two, no agreement to exclusively use PCS for handling of all materials in the HECO project. And three, interpretation of the subcontract through integration of the prime contract to permit partial termination. With regard to the first issue, the district court's conclusion that the April 4, 2012 email exchange between the parties demonstrates, quote, a meeting of the minds and all essential terms and acceptance of the subcontract, end quote, is not supported by objective analysis of the evidence as required by Hawaii law. Viewed objectively, that email stating we accept what you propose below, merely accepted the modifications to the draft contract that LVI proposed in its email of the same date in response to changes that PCS had requested. Nothing in the email communicates assent of PCS to the balance of the terms of the eight page subcontract, nor does the statement by PCS, please revise it and send it to me for signature, confirm that PCS agreed to all of the material terms and will sign the revised contract. Rather, it merely asks LVI to send the revised subcontract to PCS for that purpose. At most, it implies that PCS may sign the modified subcontract, but does not commit it to doing so. And I think that distinction is important because then you have to look at the subsequent actions of PCS. And objective analysis of those does not indicate that it considered itself to be bound. First of all, it didn't sign the revised subcontract when it was sent to it on April 23rd, and didn't sign it when LVI sent the, re-sent the subcontract for signing on October 22nd. Instead, PCS twice requested revisions and withheld its signature, pending incorporation of the revised subcontract to PCS. Importantly, when PCS received the second modified contract incorporating the revisions that it requested on October 22nd, it then had its risk manager review the modified subcontract and revise the boilerplate terms that had been in every single draft sent to it. Having its risk manager review and revise boilerplate revisions in October, and then asking LVI to incorporate those changes, quote, so I can sign and send it back to you, end quote, is entirely inconsistent with the conclusion that PCS had agreed to all of the material terms in April. Throughout the October communications, furthermore, PCS said absolutely nothing to indicate that it thought the parties already had a contract, or to request that the existing contract be amended. Rather, it continued to negotiate and expressly withheld its signature pending incorporation of its revisions. That PCS itself did not think the April 23rd version was the contract is also confirmed by the fact that when it filed its original complaint, PCS alleged that it had signed and returned the version of the subcontract attached there to as Exhibit 1, which is the modified subcontract LVI sent to PCS on October 22nd. The original complaint is at ER 1277 in Volume 8 of our record, and at paragraph 15, it specifically alleges PCS signed the HECO subcontract that LVI had sent to it and returned the signed copies to LVI. A true and correct copy of the HECO subcontract is attached as Exhibit 1. As detailed in LVI's Rule 11 demand letter, which was an exhibit to our amended Motion for Partial Summary Judgment at ER 321, there's no question that the subcontract that was attached to the original complaint as Exhibit 1 is the October 22nd version because it has 19 items in the scope of work, whereas the April 23rd version has 11. After unable to demonstrate that it had actually returned the October 22nd version that it had electronically signed, PCS then amended its complaint to delete Exhibit 1 and proceeded with an argument that it had agreed to the April 23rd version. So when you objectively review all of those communications, we think the record simply does not support the conclusion that there was a meeting of the minds of the parties at the time of the April 4th email exchange. Rather, the evidence demonstrates that there was no mutual agreement on all of the material terms at any point in time. Moving on to if the court's determination that there was a subcontract is affirmed, we next contend that the court erred in rewriting the party's agreement to include an exclusivity provision. Without using the term, the district court essentially held that the subcontract is a requirements contract by concluding that, quote, LVI hired PCS to complete all of the cleaning and waste removal services at the HECO power plant, end quote. There's no factual or legal basis for that. Let me ask you about language in the contract, which I think is the derivation of the exclusivity. And that is where it basically has payment that is contingent solely on the percentage of the work completed by PCS, which of course suggests the requirements contract that you're referencing. Why wouldn't that be superfluous if it's not exclusive? Well, I think that that language, first of all, is boilerplate language, so it probably came from a form that contemplates a different type of contract than this specific contract. And I think it's really secondary from an interpretation perspective. To me, it means essentially the same thing. Whatever work you, sorry. Your fault, sometimes it goes a little haywire. Yeah, to me it basically means that you'll get paid for whatever work you did, whether that's expressed in dollars or expressed in percentage. But it's not interpreting it to mean that we intended that they would do all the work and promise that we would only use them for the entire project, I think is going way too far. Particularly when you consider that the contract itself specifically says that the contract consists of unit prices listed on Exhibit A. And then you go to Exhibit A and it lists the price per ton or per gallon that they'll be paid to haul and dispose of 11 categories of materials without any indications of the total quantities or total payment. There's nothing other than the possible interpretation of percentage completion. There's nothing in the contract that promises that PCS will haul and dispose of all of the materials or any particular quantity. And the subcontract has got a termination without cause clause on three days' notice. So how you get to, even if you interpret percentage favorable to PCS, how do you get to, we have to use them all the way through, I don't know how you can possibly do that. If you look at the parole evidence, in addition, as I think the district court looked at some parole evidence, it looked at the wrong parole evidence. It looked at the fact that we had listed PCS as the only contractor when we submitted our bid for this purpose. That's not reliable parole evidence because that list can be changed as it was when we replaced PCS. The parole evidence the court should have looked at is that the parties excluded from the subcontract the total volume and total cost for each of those 11 items that was in PCS's bid. If you look at their bid in Exhibit P6, it's got the total quantities and total dollar amounts, and the parties did not include those in the subcontract. I think that's highly irrelevant. Then when you look at Exhibit P9, SER 39, LVI's email forwarding the first draft of the subcontract stated it was, quote, for the unit rates only, end quote. That, to me, is the most significant expression of the party's intent. Finally, when you look at when the parties negotiated and agreed to the revisions for the initial draft, in the very email that they now contend substantiate the existence of a contract, this unit price only issue comes up twice. First, with regard to item number four in the changes relating to submission of claims for additional cost to LVI, the email states, as these are unit prices, I wouldn't anticipate additional costs being an issue. With regard to item number six, relating to payment of costs incurred in the event of termination, the email states, again, unit pricing within this PO should eliminate concern on this. So the reliable parole evidence of the parties' direct negotiations all suggests unit pricing with no commitment to exclusively use PCS for the entire project. If I can, unless there are questions, I'll move on to my last issue for argument today, which is, assuming that you affirm the determination that there was a contract and that it was essentially a requirements contract, the district court erred in failing to incorporate the terms of the prime contract into the subcontract for the purposes of partial termination. It erred because it failed to consider the terms of the prime contract, which were incorporated into the subcontract through a flow-down provision. And then the court compounded its error by denying our motion for reconsideration on two erroneous bases. One, that we had failed to timely raise the issue, and two, that factual questions regarding whether PCS had knowledge of and assented to the incorporated contract were not litigated or briefed. In fact, LVI presented its legal argument at the first opportunity it had to do so. We raised partial termination in our answering trial brief, and PCS raised their counter-interpretation in their final trial brief. We had no opportunity to reply to that. We went to trial. There were no opening statements. There were no closing arguments. We were supposed to have arguments after submission of the proposed findings, facts, and conclusions of law. We addressed this issue in our proposed findings, facts, and conclusions of law. The court overlooked it and failed to consider the effective interpretation of the prime contract. But nor was it necessary. I mean, there's no lack of factual information either because the Hawaii law requires that the intent of the party be determined from the four corners of the contract. And both the prime contract and the subcontract were in evidence. And when you look at the paragraph 2 of the terms and conditions of the subcontract, clearly incorporates the prime contract. And PCS agreed to be bound by the terms of the prime contract. And then when you look at paragraph 1.59 of the prime contract, it specifically provides for the right to terminate in whole or in part for any reason at any time. So you have to interpret the subcontract. You have to look at the prime contract when interpreting the subcontract. And the subcontract specifically provides that whichever standard, in the event of a conflict, whichever standard is more, imposes a higher standard or is more onerous would control. PCS's argument that the subcontract, paragraph 121B, is more onerous fails because it argued, and the district court held, that that paragraph does not provide for partial terminations. So when it comes to partial terminations for convenience, the only applicable standard is the prime contract, paragraph 1.59A. And that clearly provides for termination on two days notice without cause. That's where we're at. That's the provision that the court should have applied in this instance. So if you get over the first two hurdles, if you affirm that there was a contract and affirm the court's conclusion that we had to give all of the work on the entire project to PCS, we request that you, at a minimum, reverse this award of $699,000 for lost profits on ACM disposal work and remand to the district court for determination of the appropriate damages based upon a February 5, 2013, partial termination. So I'll reserve the remaining moments I have for rebuttal. Thank you. Thank you. Good morning, Judges McCune, Ferris, and Beatty. May it please the court, my name is Elijah Yip. I'm counsel for the Appalachian Pacific Commercial Services, LLC. I think context is important, and I want to begin a little bit with that. I think this case is a good illustration of how money can turn friends into enemies. At first, LVI treated PCS as a valued team member in two projects, including the HECO project, which is the focus of the argument today. But LVI began losing more and more money, especially on the HECO project, and it looked for a way to cut its losses. One bright spot, though, was the waste disposal work in the HECO project, which was always profitable, but a fortuitous decision by the project owner, HECO, made that work even more profitable. And to keep more of the profits from that work, LVI cut out PCS as the waste broker, disavowed any contractual obligations, and accused PCS of overbilling, a claim that the district court would find unsubstantiated by the evidence. I think largely what the appellants in this case would like the court to do is to reweigh the evidence after a bench trial. And PCS urges the court to affirm the judgment and decisions of the trial court, basically finding that LVI is liable for breach of contract and quasi-contract. I'll address the three issues that counsel for LVI has focused on, unless the court has questions of any of the other issues. I want to first address the issue of whether there was a meeting of the minds between the two parties in this case. LVI's argument seems to be focused mainly on the email exchange between the president of PCS, Jingbo Chang, and Chad Maddock, who was an employee of LVI, particularly that email where Mr. Chang says, I accept what you propose below. And essentially what LVI would like to do is pick apart the words in that email and say that that acceptance only pertains to the proposal by Mr. Maddock to address certain concerns. But if you look at the entire chain of the back and forth between Mr. Maddock and Mr. Chang, that's simply not the case. Mr. Maddock began by sending a draft purchase order to Mr. Chang. It included all the terms, the general conditions, as well as the prices, etc. In response to that, Mr. Chang noted that there were a couple of terms and conditions that he had some comments and concerns about, relayed that to Mr. Maddock, and in response to that, Mr. Maddock proposed solutions to those concerns. And when Mr. Chang said, I accept what you propose below, what he was saying was, I accept not only your proposals to address my concerns, but the entire contract in light of the new provisions that you're recommending be inserted into the contract. And we note that when later on, a couple of months later, I'm not sure if it was a couple of months, but in April, when LVI sends back a draft of the contract for execution, those concerns are incorporated into the contract itself. And that's what the court, the district court below, found to be the controlling contract on which there was a meeting of the minds. So the acceptance was not simply to the proposal. It was to the entire contract as revised by Mr. Maddock. LVI's counsel then argues that the objective evidence shows there was no meeting of the minds because there were further negotiations in October. And I think a little bit of context there is important because what occurred there is that there were essentially two phases to the contract. Well, not two phases. I misspoke. There are two parts to the work that PCS was supposed to do. One part of the work is on a unit rate basis, so by volume. The other part of the work is on a flat fee basis, a lump sum basis. So certain services, for example, like cleaning, it's not done on a volume basis. It's one job. There's one price for that. The contract that the court found there was mutual assent to referred to the unit rate portion of the services. And that is the context in which I believe Mr. Marsh referred to for the unit rates only. That's what that refers to. This PO that was sent by Mr. Maddock, which Mr. Chang agreed to, referred to the unit rate services, not the flat fee lump sum services. The October negotiations put in the lump sum work with the unit rates. And I think the reason for that is because LVI did not receive a copy of a signed contract. So in its mind, it was still open for negotiations, and it was putting in all the services into one contract. But in fact, Mr. Chang had already accepted there was agreement as to the unit rate portion of the services. So there was a contract as to the unit rates. We are not suggesting, we never suggested that there was a meeting of the minds as to the lump sum services that were the subject and part of the October negotiations. As far as PCS's suggestion of additional terms in the October negotiations, the reason for that is that apparently after the April negotiations and back and forth between Mr. Maddock and Mr. Chang, there were other POs for other projects that PCS and LVI had negotiated and negotiated certain terms at the boilerplate. And I'll refer the court to Record 791. It's an email between Mr. Chang and Damaris Krizada, who works for LVI, but contained in that email chain is also an email between Mr. Lam, who is PCS's risk manager, and Mr. Chang commenting on the October draft of the PO. And over there it says, Mr. Lam tells Mr. Chang, attaches the revised and redlined version, suggests the changes are based on previous LVI PO and lists the number, using the indemnity language they provided and agreed to for that PO. So basically what PCS was trying to do in that instance was saying, we modified the boilerplate language for another PO and now for this project, for the HECO project, that lump sum phase, let's put the same language into there. But the fact of the matter is that that did not change the acceptance of the unit rate services. There was already agreement on that. So if anything, the October negotiations were simply a proposal to amend the scope of work in the contract that was already agreed to. There was no agreement ultimately to the October contract, but that does not affect the validity of the unit rate contracts, the one that the court found that there was a meeting of minds to. Turning secondly to the issue of whether there was exclusivity, and I think the court does zero in on one of the phrases that the district court looked at, which led to its decision that there was exclusivity, and that is the percentage of the work. The court is correct that if the contract did not establish an exclusive relationship, that language would be superfluous, because why would it say percentage of the work? That denotes a body of work, and you get a percentage by – it has to be a numerator and denominator. It basically would – LVI's interpretation would knock out the denominator. Yes, it may be boilerplate, but that's LVI's form. It put it in there. It decided to put it in there. It could have stricken it out if it wanted to, but it did not. Just because contract provisions are boilerplate does not mean that they are to be ignored. On the other hand, there is an argument that the for convenience clause, termination clause, may be really rendered the whole thing illusory under the covenant of good faith. What is your view on that? That's right. If they could simply terminate at any time for any reason – in other words, if it's a purely at-will contract, then it would be illusory, and the language of the termination provision should be interpreted to import an exclusivity requirement. I make the distinction between a purely at-will contract versus a termination for convenience provision because they're not the same thing. An at-will provision says at any time, unconditionally, no recourse. A termination for convenience clause, on the other hand, allows the contracting party, the general in this case, to terminate for convenience. So, for example, if it goes along the project and it believes that it's not cost-effective to do the project anymore, it could at that point terminate, but subject to certain conditions, including notice. But also, written into this contract is the implied covenant of good faith and fair dealing. Hawaii law recognizes that every contract has a covenant written into it, and that's not unique to Hawaii. The federal courts have recognized that in interpreting termination for convenience provisions as well. So if the purpose of terminating for convenience is simply to get a better deal, to deprive the other party of the bargain, that's not okay. That would be a limitation on the implication of that provision. You can terminate if economically it's not feasible to go on with the project anymore. That's convenience, but not simply to get a better deal. And that's precisely what LVI did in this case. It found a better deal. It found a way to keep the profits. And it, in its mind, invoked the termination for convenience provision. Which, by the way, I would point out to the court, there is absolutely no evidence in the record that LVI actually relied on that termination for convenience clause, or the prime contract's termination. I would note that in discovery, LVI stated that it did not issue any notice of termination at all to PCS. And its theory of termination kept evolving as the litigation wore on. And so anyway, I think one more point I'd like to make in response to Mr. Marsh's argument regarding the percentage of work. There was the question raised about how would one calculate the entire amount of work for percentage purposes. I think the answer is you go back and you look at the prime contract. Because there are units, so there are volumes there. There are volumes there. So this contract basically requires LVI to use PCS for all its needs as far as waste transportation and disposal. And you need to calculate percentage of the work in case there has been a termination for convenience invoked. Look to the prime contract. Look at, add up all the units there, and that gives you the basis for calculating percentage. It's not inconsistent to interpret percentage of work phrased that way. I want to briefly touch on the third issue that Mr. Marsh presented to the court regarding the incorporation argument as well as the incorporation of the prime contract's termination for convenience into the HECO subcontract. There are procedural issues as well as substantive issues in this issue. I think the first place to start is whether LVI is even timely in raising this argument that the prime contract was somehow incorporated into this subcontract. As I noted, LVI kept changing its position and its legal theory as far as partial termination. Before trial and in discovery, LVI said that it did not give any notice of termination to PCS. In its trial brief and at trial, LVI took the position that it did provide notice of partial termination, but it's important to note that that was based not on the prime contract, but on the HECO subcontract, on paragraph 21B of the HECO subcontract. It was to that argument that PCS responded that 21B actually does not allow partial termination because unlike the termination for cause provision in the paragraph before, it doesn't have the language of terminating in whole or in part. We distinguish that provision. Then LVI changes legal theory again. For the first time in its findings of facts and conclusions of law after the bench trial, the evidentiary portion, LVI then advanced the theory that the prime contract is what allowed it to terminate in part. After the district court issued its findings of facts and conclusions of law, LVI then argued in its motion for reconsideration that the prime contract was incorporated in that respect. What we see here is that this argument was not preserved. It was not preserved below, and it certainly is not proper for the court then to go back and say the district court, you erred in not considering the argument because it was presented in a timely fashion. Even if it did, even if it had to consider the argument on its merits, substantively the district court did not err in rejecting it because any error would have been harmless. It's a meritless argument. I think the first thing to note is that the first to breach rule operates here. That is the rule that if you are the party that is the first to breach the contract, so assuming there was a contract, that's issue one. Assuming it's exclusive, issue two. There is no question that LVI diverted the asbestos work away from my client, and that was the breach. It was the first to breach. The first to breach rule in Hawaii holds that if you're the first to breach the contract, then you do not have the right to hold the other party to its contractual obligations. So that rule alone would obviate the argument that LVI is making. But beyond that, the district court was correct to reject the argument in the posture of a motion for reconsideration because it would have required more factual development. And also by looking at the incorporation provision in the subcontract, which is paragraph two, it is highly questionable whether the termination for convenience provision in the prime contract was incorporated. And the reason for that is that paragraph two of the subcontract states that where you have an inconsistency between the prime contract provisions and the subcontract provisions, the provision that imposes the higher standard or that is more onerous on the subcontract controls. Now what we have in the prime contract is a termination for convenience provision, but it provides for certain remedies for the subcontractor, or in this case it would be the general contractor, in the case of termination on those grounds. If you look at the subcontract, there's also a termination for convenience provision, but the remedies allowed for the subcontractor there are much more limited. There are certain costs that the general contractor could have recovered under the prime contract. So if that flowed down into the subcontract level and LVI is stepping into the shoes and invoking paragraph 1.59A of the prime contract to terminate, the remedies available to PCS would actually be much more robust. So by operation of that proviso in paragraph two, that where inconsistency arises, the provision that is more onerous than the subcontractor controls, then it's not the prime contract that would control. It would be the termination for convenience provision in the subcontract. But the problem there, of course, is that that termination for convenience provision does not allow for partial termination. So at the very least, there's a question of fact of what the parties knew about that and which provision would be more onerous, and there was no opportunity to develop that at trial because, again, the argument wasn't raised until after the evidentiary portion of the trial. And for that reason, the district court rejected the argument on a motion for reconsideration, and this court should affirm that decision. So in summary, unless the court has any other questions, I think it's clear that there was a contract, there was a meeting of the minds, at least as to the unit rate portion of the work that PCS was going to do. The language of the subcontract points to an intent for the parties to be exclusive as to waste disposal. And finally, LVI was not entitled to partially terminate, whether under the subcontract or under the prime contract provisions. And so we urge the court to affirm in all respects. Thank you. Thank you. Excuse me. I'll respond to Mr. Yip's arguments in the same sequence, first with regard to meeting of the minds. The actions of PCS at the time the April contract was sent to it and following all the way through October are not consistent with the argument that they're making today, that in fact they accepted everything in April, number one. Number two, his discussions about the revisions to the contract in October, what PCS's intentions were then, are interesting, but they don't explain why PCS, when they filed their original complaint, alleged that the October contract was the contract that they signed and sent back to LVI. So PCS's own actions and their own statements, including the complaint that they filed in federal court, I guess they filed in state court and we removed it to federal court, but the original complaint are completely inconsistent with their arguments. So their explanations today as to what they were doing in April of 2012 are not consistent with their actions throughout 2012, all the way up to the time that they filed the complaint, and I believe in March of 2016. With regard to the exclusivity arguments, I think, as I suggested before, that greater weight has to be given to the specific terms of the contract that were drafted by the parties, rather than to the percentage language in the boilerplate terms. Notwithstanding their argument as well, I would also note that there's no total number to divide into to arrive at a percentage completion. There is no total number in this subcontract. There just is per ton, per gallon of materials hauled and disposed. There's no way to do the numerator-denominator calculation that Mr. Yip suggested. Who inserted that clause in the contract? That is boilerplate terminology that came from LVI. There's no question about that. I don't think there's a clause in this contract that requires the contract to be interpreted against either party. But that's where the percentage comes from. But I think it's got to be given significantly less weight than the specific language that was drafted for this contract, as I've discussed. With regard to Mr. Yip's argument about the implied covenant of good faith and fair dealing, and LVI's intent to terminate PCS to get a better deal and to scoop the profits, first of all, we have no findings of that nature from the district court. Secondly, what he persists in not recognizing is that this was a losing job for LVI. We lost a million even after terminating PCS. We would have lost two million if we hadn't terminated PCS. So the purported bad faith is trying not to lose any more money than we had to lose on this job, and I don't think that's the same thing as scooping their profits. With regard to the argument that LVI stated in discovery that we did not issue a notice of termination of the contract, I think that's a misrepresentation of the evidence. In fact, we responded to a request for admission by confirming that we did not issue a notice terminating the subcontract, identifying it by number, and in that same admission we said we never had a signed contract so we didn't know that there was a contract. That was our problem. We didn't operate as though the April contract was a contract. We never thought we had a contract. But that admission would be applicable if we were talking about a termination in whole of the contract, but that's not what we're talking about. What we're talking about here is a partial termination. In fact, we sent a letter or an e-mail that clearly communicated to PCS that we're not going to use your services anymore for ACM disposal, and Mr. Chang from PCS testified that he clearly understood that that meant he wasn't going to be doing that work any longer, so there was an effective partial termination. You've exceeded your time, so you may want to wrap up. Oh, I've got one minute left. No, no, it's red. Oh, I'm sorry. I'm sorry. I know. It does get confusing, but I just wanted to bring that to your attention. If you would summarize now, I'd appreciate it. Okay. The last thing I would say was the first to breach rule simply doesn't apply. We're not making an affirmative claim. We're asserting a proper interpretation of a contract. So I will rest at that point. Thank you, Your Honors. Thank you. I thank both counsel this morning. Pacific Commercial Services versus LVI Environmental Services is submitted, and we're adjourned for the morning. Thank you. Thank you.
judges: Farris, McKeown, Bade